NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

# IN THE
# ARIZONA COURT OF APPEALS
## DIVISION ONE

CHRISTINE HAGUE, individually and on behalf of MacAllister and
Aiden Hague, minors, *Plaintiff/Appellant*,

*v.*

BILL HOUSTON INSURANCE AGENCY, an Arizona Insurance Broker,
*Defendant/Appellee.*

CHRISTINE HAGUE, individually and on behalf of MacAllister and
Aiden Hague, minors, *Plaintiff/Appellee*,

*v.*

BRIAN STEVENS and ERIKA STEVENS, husband and wife,
*Defendants/Appellants*.

No. 1 CA-CV 13-0613
FILED 9-8-2015

Appeal from the Superior Court in Maricopa County
No. CV2010-010618
The Honorable Lisa Daniel Flores, Judge

**AFFIRMED IN PART; REVERSED IN PART; REMANDED WITH
DIRECTIONS**

Catanese Law Firm, P.C., Phoenix
By David J. Catanese
*Counsel for Plaintiff/Appellant and Plaintiff/Appellee Christine Hague*

David Bell & Associates, P.L.L.C., Phoenix
By David M. Bell, Howard L. Andari
*Counsel for Defendant/Appellee Bill Houston Insurance Agency and
Defendants/Appellants Brian Stevens and Erika Stevens*

---

**MEMORANDUM DECISION**

Judge Winthrop delivered the decision of the Court, in which Presiding Judge Patricia K. Norris and Judge John C. Gemmill joined.

---

**W I N T H R O P**, Judge:

¶1 After her husband Christopher died as the result of a motor vehicle accident, Christine Hague ("Hague") filed a lawsuit individually and on behalf of their sons, MacAllister and Aiden Hague, against two independent State Farm insurance agents - the Bill Houston Insurance Agency, Inc. ("the Houston Agency") and Brian Stevens ("Stevens")[1] (collectively, "Defendants") – alleging each had fallen below the applicable standard of care by failing to properly advise her of the benefits of purchasing uninsured motorist ("UM") and underinsured motorist ("UIM") insurance coverage (collectively, "UM/UIM" coverage). Hague alleged that, had Defendants properly advised her before the accident, she would have purchased UM/UIM coverage limits for the motorcycle in an amount equal to her bodily injury liability ("liability") coverage limits, which were $500,000 per person/$500,000 per accident ("$500,000/$500,000"), rather than the $100,000/$300,000 UM/UIM coverage limits she carried.

¶2 This decision addresses Hague's appeal of summary judgment in favor of the Houston Agency and the denial of Hague's motion

---

[1] Hague named both Brian Stevens and his wife, Erika Stevens, as defendants. Erika Stevens' only alleged involvement in this case is as Brian Stevens' spouse; accordingly, we refer to both Brian Stevens individually and Brian and Erika Stevens collectively as "Stevens."

for a new trial, and Stevens' appeal of the trial court's order granting Hague's motion for a new trial, which reversed the court's previous decision to grant a directed verdict[2] in favor of Stevens. For the following reasons, we affirm summary judgment in favor of the Houston Agency and the trial court's denial of Hague's motion for a new trial as to the Houston Agency, reverse the court's order granting Hague's motion for a new trial as to Stevens, and remand with directions to enter judgment in favor of Defendants.

## FACTS AND PROCEDURAL HISTORY[3]

¶3        Before Hague settled in Arizona, she lived in New York, and her mother, Jacqueline Polak ("Polak"), typically purchased automobile insurance for her through a State Farm insurance agent. In December 2000, Hague and Christopher moved from New York to Arizona, and they married in May 2001. At the time of the move, Hague owned a 1995 Saturn and a 1973 International Scout Jeep. After relocating to Arizona, Hague continued to almost exclusively rely on Polak for help regarding her insurance needs, although on a few occasions Hague handled details such as changing her address without Polak's help.[4]

¶4        In March 2001, Hague went to the Houston Agency, an independent State Farm insurance agent located in Scottsdale, where she purchased automobile insurance policies for the Saturn and the Jeep, each with $25,000/$50,000 liability and UM coverage limits; Hague expressly rejected UIM coverage. Hague later replaced the Saturn with a 2000 Ford Expedition, and in September 2001, Polak and Hague went to the Houston Agency, where they obtained $100,000/$300,000 liability coverage limits on the Ford, continued the $25,000/$50,000 liability coverage limits on the Jeep, and purchased $100,000/$300,000 UM coverage limits for both vehicles, but declined UIM coverage as to each vehicle. By January 2004, the Ford had $100,000/$300,000 liability coverage limits, the Jeep had $25,000/$50,000 liability coverage limits, and both vehicles had

---

[2]        We alternately refer to the motion as one for judgment as a matter of law. *See* Ariz. R. Civ. P. 50(a) ("Judgment as a Matter of Law").

[3]        Although some minor factual disputes exist among the parties, the material facts of this case are generally undisputed.

[4]        In 2006, Polak moved to Arizona, where she lived with Hague and Christopher.

$100,000/$300,000 UM/UIM coverage limits. In other words, the Ford's liability and UM/UIM coverage limits were equal, and the UM/UIM coverage limits on the Jeep were significantly larger than the liability coverage limits.

¶5         In April 2005, Polak, on behalf of herself and Hague, purchased insurance for a 2004 Yamaha 600 CC motorcycle she had given to Christopher. The Yamaha insurance had liability and UM/UIM coverage limits set equally at $100,000/$300,000.[5]

¶6         In June 2005, Bill Houston retired and closed the Houston Agency, and Mike Kish ("Kish"), a State Farm agency field executive, was assigned as the temporary servicing agent for Hague and Polak. In October 2005, insurance on the Yamaha was renewed through Kish, with liability and UM/UIM coverage limits again set equally at $100,000/$300,000.

¶7         On December 12, 2005, Polak increased the liability coverage limits of all three vehicles – the Yamaha, Ford, and Jeep - from $100,000/$300,000 to $500,000/$500,000, but she did not increase the UM/UIM coverage limits on the vehicles. Instead, on December 20, 2005, Hague signed an "Acknowledgement of Coverage Selection or Rejection" form expressly rejecting the opportunity to increase the UM/UIM coverage limits on the Jeep, and on January 10, 2006, Polak signed Selection/Rejection forms acknowledging her decision to increase the liability coverage limits for the Yamaha and Ford policies to $500,000/$500,000, but rejecting the opportunity to increase the UM/UIM coverage limits on those policies.[6]

---

[5]      It is irrelevant whether the UM/UIM election was made by Polak or Hague because both were named as insureds under the Yamaha policy and the election applied to all persons named as insureds. *See* Ariz. Rev. Stat. ("A.R.S.") § 20-259.01(B) (2015) ("The selection of limits or rejection of coverage by a named insured or applicant on a form approved by the director shall be valid for all insureds under the policy.").

[6]      The Selection/Rejection forms warned in part as follows:

> Arizona law requires that insurers make available Uninsured Motor Vehicle Coverage. Uninsured Motor Vehicle Coverage pays you and your passengers for bodily injury damages

¶8          Meanwhile, in letters dated December 27, 2005, State Farm informed Hague and Polak that, effective January 1, 2006, Stevens would become their new State Farm servicing agent.  Kish's office faxed the signed Selection/Rejection forms to Stevens on January 22, 2006.  As a result, the three motor vehicle policies in the Hague household – the Yamaha, Ford,

_____

> resulting from an accident for which an uninsured driver is legally liable up to your coverage limits.
>
> Arizona law also requires that insurers make available Underinsured Motor Vehicle Coverage.  Underinsured Motor Vehicle Coverage protects you if you are involved in an accident for which the other driver is legally liable and bodily injury damages to you or your passengers exceed the other driver's bodily injury liability limits.  It provides protection up to your Underinsured Motor Vehicle Coverage limits for damages in excess of the amount collected from the other driver or the other driver's insurance.
>
> I acknowledge that in accordance with the law of the State of Arizona the company has given me the opportunity to purchase Uninsured Motor Vehicle Coverage and Underinsured Motor Vehicle Coverage in an amount equal to my motor vehicle bodily injury liability coverage.
>
> . . . .
>
> I understand and agree that this rejection of coverage or selection of limits will apply to this policy, to any policy that is a reinstatement, transfer, substitution or modification of this policy and to all future renewals of this policy or such other policy.  I also understand that this rejection or selection is valid and binding on all insureds, including my spouse, under the policy.  If I decide to select another option at some future time, I must let the company know in writing.
>
> I have read and I understand the above explanation and offer of Uninsured Motor Vehicle Coverage and Underinsured Motor Vehicle Coverage.  I also understand that I have the opportunity to ask for an additional explanation from my agent.

and Jeep – all had liability coverage limits of $500,000/$500,000 and UM/UIM coverage limits of $100,000/$300,000. The $500,000/$500,000 liability and $100,000/$300,000 UM/UIM coverage limits remained on the Yamaha, and Stevens remained Hague's insurance agent, through the time of Christopher's accident.

¶9  On April 2, 2008, Christopher died when the Yamaha motorcycle he was operating collided with the back (rear passenger-side portion) of a van making a left turn at an intersection. Immediately before the accident, Christopher was observed weaving through traffic by making multiple lane changes at a high rate of speed while travelling northbound on Scottsdale Road. At the time of the collision, he was travelling approximately eighty-five miles per hour in a posted forty-five mile-per-hour speed zone, and witnesses observed the motorcycle travelling on one wheel shortly before impact.[7] After Christopher's death, the van driver's insurance company, without formally acknowledging any fault on the part of its insured, paid its liability limit of $100,000, and State Farm paid its UIM limit of $100,000.

¶10  On March 29, 2010, Hague filed a complaint, alleging the insurance proceeds she received were insufficient to fully compensate her for Christopher's death, and the Houston Agency and Stevens had fallen below the necessary standard of care in acting as her insurance agents because they had failed to recommend the Yamaha's UM/UIM coverage limits be increased to equal its liability coverage limits. Hague alleged that, when she and Polak went to the Houston Agency to purchase automobile insurance in 2001, although they purchased liability insurance, they declined to purchase UM/UIM insurance with coverage limits equal to the liability insurance based on information they received from a female insurance broker (later identified by Hague only as "Patty"), who informed them that purchasing such a significant amount of UM/UIM insurance "was only necessary if they did not have good health care insurance

---

[7] The details of the accident recounted in paragraph nine of this decision were taken from the Scottsdale Police Department's traffic accident report. That report was attached as an exhibit to Defendants' separate statement of facts in support of their motion for summary judgment and listed as a defense exhibit at trial, but was not offered or admitted in evidence at trial. Christopher was listed on the accident report as travelling at a "speed too fast for conditions," and the driver of the van was documented as having taken "no improper action."

coverage."[8] Hague further alleged that, after Stevens became her insurance agent, he failed to explain the risks, consequences, or benefits of UM/UIM coverage, even after she purchased insurance for the motorcycle. Hague maintained that, had she been properly advised about the protections afforded by UM/UIM coverage, she would have purchased UM/UIM insurance with coverage limits equal to her liability coverage limits.

**¶11** Defendants moved for summary judgment on Hague's claims against them, arguing that, for several years before the Yamaha policy was purchased, Hague and/or Polak had selected UM/UIM coverage limits for Hague's policies that were equal to or greater than her liability coverage limits, indicating Hague had not relied on the advice allegedly given by "Patty." Defendants further noted Polak had initially purchased insurance for the Yamaha from the Houston Agency with equal liability and UM/UIM coverage limits, again demonstrating her lack of reliance on "Patty's" advice, and when the decision was later made to increase the liability coverage limits of the Yamaha policy to $500,000/$500,000 but continue the UM/UIM coverage limits at $100,000/$300,000, Polak had signed the Selection/Rejection form warning her of the potential consequences of doing so. Citing A.R.S. § 20-259.01(A) and (B), Defendants maintained (1) they had fulfilled the statutory duty of offering, in writing, UM/UIM coverage with limits not less than the liability limits of the policy; (2) under *Tallent v. National General Insurance Co.*, 185 Ariz. 266, 268, 915 P.2d 665, 667 (1996), no duty existed for them to provide a further explanation of UIM coverage; (3) any duty of the insurance agents did not go beyond that of the principal insurance company (State Farm); and (4) even assuming Defendants had such duties, those duties were not breached. Hague responded that, although A.R.S. § 20-259.01(A) and (B) set forth the duties of an insurance *company*, the statute did not refer to insurance *agents*, who Hague asserted were subject to a heightened standard of care given their special relationship with their insureds. Following briefing and oral argument, the trial court took the matter under advisement, and later

---

[8] The complaint did not specify the date of the 2001 meeting at the Houston Agency, but subsequent testimony by Hague and Polak made clear the complaint was referring to the September 2001 meeting, at which Polak and Hague obtained the $100,000/$300,000 liability coverage limits on the Ford, continued the $25,000/$50,000 liability coverage limits on the Jeep, and purchased $100,000/$300,000 UM coverage limits for both vehicles, but declined UIM coverage as to both vehicles. As acknowledged in her complaint and reflected in the record, however, Hague subsequently purchased $100,000/$300,000 UM/UIM coverage limits on the vehicles.

granted summary judgment in favor of the Houston Agency, but denied summary judgment as to Stevens.[9]

¶12          The matter proceeded to a jury trial on Hague's claim against Stevens. Hague testified and presented testimony from Polak, Stevens, and Frederick C. Berry, Jr., ("Berry") who opined as to the applicable standard of care for a reasonable insurance agent.[10]

¶13          After Hague rested at the close of her case-in-chief, Stevens moved for a directed verdict, arguing that (1) A.R.S. § 20-259.01(A) and (B) established the statutory duties applicable to Stevens, and Stevens had met the applicable standard of care by providing Hague and Polak a written offer of UM/UIM coverage limits equal to the liability coverage limits on the Yamaha, and (2) in any event, Hague had not met her burden of showing she had been damaged by any breach on the part of Stevens because she had failed to provide evidence the driver of the van was at fault for the April 2008 accident; thus, Hague could not show she would have been eligible to recover more than the $100,000 UIM coverage limits she had

---

[9]          With regard to Stevens, the court reasoned as follows:

> As for the policies sold to [Hague] and/or Ms. Polak after 2005, it is undisputed that the UM/UIM coverage purchased varied; in some years, it equaled the bodily injury coverage and in other years, it was less than the bodily injury coverage. The parties' experts disagree about whether Defendant Brian Stevens had a duty to explain the risks and benefits of UM/UIM coverage to Plaintiff and/or Ms. Polak in this situation, and whether he met the standard of care for a reasonable seller of insurance coverage.

[10]          Berry testified in part that, in his judgment, the standard of care for an insurance professional in Arizona is to not only fully explain the risks and benefits of UM/UIM coverage, but to strongly recommend the insured purchase UM/UIM coverage equal to his or her liability limits. Berry opined that, by failing to do so once he became aware of the "gap" in coverage, Stevens fell below the standard of care of an insurance agent. Berry further maintained that, although providing the written form required by A.R.S. § 20-259.01 addressed the obligation of the insurance company to make UM/UIM coverage available, "providing the form has nothing to do with the standard of care of insurance producers in Arizona," and "[t]here is no case law at all governing the standard of care for insurance producers in Arizona like Mr. Stevens. It doesn't exist."

already received from her State Farm policy. After considering lengthy argument by Hague, the trial court found Hague had failed to present evidence of the facts of the accident sufficient to establish fault, and denied motions to reopen by Hague. The trial court then granted Stevens' motion for a directed verdict.

¶14 The trial court entered a signed judgment in favor of Defendants, and Hague moved for a new trial. The trial court denied the motion for a new trial as to the Houston Agency but granted the motion as to Stevens after concluding Hague's testimony had been sufficient to find some degree of fault on the part of the van's driver.

¶15 On September 3, 2013, the trial court issued a signed minute entry entering judgment in favor of the Houston Agency and granting Hague a new trial as to Stevens. Both Hague and Stevens timely appealed. This court has jurisdiction pursuant to A.R.S. § 12-2101(A)(1) and (5)(a) (Supp. 2014).

**ANALYSIS**

I. *Standard of Review*

¶16 Summary judgment is proper when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(a); *accord Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). A motion for summary judgment should be granted if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that no reasonable person could find for its proponent. *See Orme Sch.*, 166 Ariz. at 309, 802 P.2d at 1008. In deciding a motion for summary judgment, a trial court applies the same standards that it uses in ruling on a motion for judgment as a matter of law. *See id*.

¶17 Judgment as a matter of law lies where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Ariz. R. Civ. P. 50(a). The underlying question is whether "any substantial evidence could lead reasonable persons to find the ultimate facts to support a verdict." *Goodman v. Physical Res. Eng'g, Inc.*, 229 Ariz. 25, 28, ¶ 6, 270 P.3d 852, 855 (App. 2011) (citations omitted).

¶18 Instead of the *de novo* standard of appellate review applicable when evaluating a grant of summary judgment or judgment as a matter of

law,[11] we apply an abuse of discretion standard when reviewing a trial court's decision to grant or deny a new trial. *See McBride v. Kieckhefer Assocs., Inc.*, 228 Ariz. 262, 266, ¶ 16, 265 P.3d 1061, 1065 (App. 2011) (citing *City of Glendale v. Bradshaw*, 114 Ariz. 236, 237-38, 560 P.2d 420, 421-22 (1977); *Delbridge v. Salt River Project Agric. Improvement & Power Dist.*, 182 Ariz. 46, 53, 893 P.2d 46, 53 (App. 1994)). "We apply a more liberal standard when reviewing an order granting a new trial than an order denying one." *Id.* (citing *Caldwell v. Tremper*, 90 Ariz. 241, 246, 367 P.2d 266, 269 (1962); *Englert v. Carondelet Health Network*, 199 Ariz. 21, 25, ¶ 5, 13 P.3d 763, 767 (App. 2000)).

## II.     The Houston Agency

**¶19**        Hague argues the trial court erred in granting summary judgment in favor of the Houston Agency and in denying her motion for a new trial. We disagree.

**¶20**        In Arizona, every insurer[12] writing automobile liability or motor vehicle liability policies must offer in writing to the named insureds UM/UIM coverage with limits not less than the bodily injury liability limits of the policy. A.R.S. § 20-259.01(A)-(B). However, our supreme court has consistently rejected imposing a duty on insurers to further explain UM/UIM coverage to prospective purchasers of that coverage. *See Tallent*, 185 Ariz. at 268, 915 P.2d at 667 ("The imposition of a requirement for an explanation of coverage is, we believe, both unwarranted by the statute and unwise."); *accord Ballesteros v. Am. Standard Ins. Co. of Wis.*, 226 Ariz. 345, 350, ¶ 22, 248 P.3d 193, 198 (2011) (rejecting imposing a comprehension requirement onto § 20-259.01, despite its "remedial" nature). *See also Newman v. Cornerstone Nat'l Ins. Co.*, 237 Ariz. 35, 36-37, ¶¶ 7-11, 344 P.3d 337, 338-39 (2015) (applying the reasoning of *Tallent* and *Ballesteros* in holding that a written notice offering UM/UIM coverage does not need to include the premium price for a valid written offer of UIM coverage under A.R.S. § 20-259.01); *accord Garcia v. Farmers Ins. Co. of Ariz.*, 191 Ariz. 410, 412, ¶ 19, 956 P.2d 537, 539 (App. 1998) (citing *Tallent*, 185 Ariz. at 268, 915 P.2d at 667).

---

[11]      *See Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12, 69 P.3d 7, 11 (2003) (summary judgment); *Shoen v. Shoen*, 191 Ariz. 64, 65, 952 P.2d 302, 303 (App. 1997) (directed verdict/judgment as a matter of law).

[12]      An "insurer" is defined as "every person engaged in the business of making contracts of insurance." A.R.S. § 20-104 (2015).

¶21        Against this statutory backdrop, we also recognize that, as a general rule, persons who hold themselves out to the public as possessing special knowledge, skill, or expertise must perform their activities in a manner commensurate with the standard of their profession; otherwise, they may be held liable under ordinary tort principles of negligence for damage caused by their failure to adhere to the standard. *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 398, 682 P.2d 388, 403 (1984). Insurance agents perform a personal service for their clients, advising them about the types and extent of coverage available; accordingly, insureds often rely, not unreasonably, on the agent's expertise when choosing an appropriate insurance contract. *Id.* (citations omitted). Consequently, in Arizona, insurance agents owe "a duty of 'reasonable care, skill, and diligence' in dealing with clients." *Webb v. Gittlen*, 217 Ariz. 363, 367, ¶ 20, 174 P.3d 275, 279 (2008) (quoting *Darner*, 140 Ariz. at 397, 682 P.2d at 402); *accord Wilks v. Manobianco*, 237 Ariz. 443, 445, ¶ 6, 352 P.3d 912, 914 (2015) (holding that an insurance agent's compliance with A.R.S. § 20-259.01 does not preclude a common law negligence claim against the agent for failure to procure UIM coverage the insured has allegedly requested); *see also Sw. Auto Painting & Body Repair, Inc. v. Binsfeld*, 183 Ariz. 444, 448, 904 P.2d 1268, 1272 (App. 1995) (holding that a material question of fact existed whether an insurance agency had breached the standard of care applicable to the duty owed its clients). The general rule in Arizona is that a defendant may be held liable if the defendant's conduct contributed to the result and if that result would not have occurred 'but for' the defendant's conduct. *Ontiveros v. Borak*, 136 Ariz. 500, 505, 667 P.2d 200, 205 (1983).

¶22        In granting summary judgment in favor of the Houston Agency, the trial court reasoned as follows:

> It is undisputed that Defendant Bill Houston Agency sold the initial policy [covering the Yamaha motorcycle] to Ms. Polak in April 2005, and the policy sold had equal limits for bodily injury coverage and UM/UIM coverage. This was the only transaction between Plaintiff (and/or her mother) and Defendant Bill Houston Agency. The parties' experts agree that Defendant Bill Houston Agency was not required to provide any explanation of UM/UIM coverage in this situation.

> The Court finds that there is no genuine issue of material fact with regard to Defendant Bill Houston Agency's meeting the standard of care when he sold the initial policy in April 2005.

IT IS ORDERED granting summary judgment as to all
claims against Defendant Bill Houston Agency.

**¶23**        Hague argues the Houston Agency had a duty to exercise reasonable care, skill, and diligence in offering her insurance, and the standard of care applicable to its duty required the Houston Agency to strongly recommend she purchase UM/UIM coverage at limits equal to or greater than the liability limits. Hague maintains the trial court erred in granting summary judgment because, had the court applied the standard of care advocated by her expert witness (Berry), she could have demonstrated a breach of that standard of care and resulting harm arising directly from that breach.

**¶24**        In analyzing Hague's argument with respect to the Houston Agency, we need not and do not decide whether Arizona should adopt the standard of care espoused by Hague and Berry. Instead, we conclude that, even were such a heightened standard of care to apply, summary judgment was appropriate because, as recognized by the trial court, the undisputed material facts demonstrate the Houston Agency met that standard when it sold the initial Yamaha policy to Polak in April 2005. Hague's core allegation against the Houston Agency is that Polak would have purchased UM/UIM insurance with coverage limits equal to the liability coverage limits had Polak and Hague been properly advised about the protections afforded by UM/UIM coverages. In fact, however, that is exactly what Polak did when she purchased the Yamaha policy with identical $100,000/$300,000 liability and UM/UIM coverage limits. The Houston Agency offered, and Polak accepted, UM/UIM coverage limits "not less than the liability limits for bodily injury." A.R.S. § 20-259.01(A)-(B). Polak and Hague did not alter those coverage limits when renewing the Yamaha policy in October 2005, and by that time, Mike Kish had replaced Bill Houston as their servicing agent. Consequently, when Polak decided in December 2005 to increase the liability coverage limits of the Yamaha policy to $500,000/$500,000 without a corresponding increase in the UM/UIM coverage limits, the Houston Agency was no longer her servicing insurance agent, and neither Hague nor Polak ever contacted the Houston Agency for the transaction of increasing the liability coverage limits of the Yamaha policy without simultaneously increasing the UM/UIM coverage limits.

**¶25**        Moreover, even were we to conclude the Houston Agency earlier breached the applicable standard of care through the alleged statements of its agent, "Patty," the facts make clear that both Hague and Polak rejected "Patty's" alleged advice long before purchasing insurance for the Yamaha from the Houston Agency. In fact, by no later than January

2004, the Ford had equal $100,000/$300,000 liability and UM/UIM coverage limits, and the Jeep had $100,000/$300,000 UM/UIM coverage limits, despite having only $25,000/$50,000 liability coverage limits. Thus, the premise of Hague's argument - that she and Polak believed UM/UIM coverage was unnecessary based on "Patty's" alleged statement – falls flat because her and Polak's actions belie her argument. Hague and Polak obviously knew enough about the nature and value of UM/UIM insurance coverage to purchase a significant amount of that coverage (in an amount equal to or greater than their liability coverage limits) under their vehicles' policies, and it is simply too speculative for a trier of fact to reasonably conclude they relied on "Patty's" alleged bad advice years later when purchasing from a different agent, especially when they did not rely on that advice when buying insurance through the first agent.[13] Because Hague cannot demonstrate that any breach of the standard of care by the Houston Agency – no matter the standard - caused her damage, the trial court did not err in granting summary judgment in favor of the Houston Agency or abuse its discretion in denying Hague's motion for a new trial.[14] *See Orme Sch.*, 166 Ariz. at 309, 802 P.2d at 1008; *Pullen v. Pullen*, 223 Ariz. 293, 296, ¶ 10, 222 P.3d 909, 912 (App. 2009).

   III.   *Stevens*

¶26       Stevens argues the trial court erred in reversing judgment as a matter of law and granting Hague a new trial because (1) Stevens had no duty to explain UM/UIM coverage beyond the statutory requirements of A.R.S. § 20-259.01, and (2) Hague failed to establish legal entitlement to UM/UIM benefits with substantial evidence of fault on the part of the van driver. Because we find the second issue dispositive, we address only that issue.

¶27       Hague's UIM claim arises from legal rights to pursue a recovery against an underinsured third-party tortfeasor (the van driver).

---

[13]    Further, on multiple occasions over many years, Hague and Polak signed UM/UIM Selection/Rejection forms that required them to make affirmative decisions regarding UM/UIM coverage and contained the cautionary and explanatory language set forth in footnote 6 of this decision. Polak acknowledged she could understand all of the language contained in those forms.

[14]    Because we affirm on this basis, we do not address the Houston Agency's other arguments in support of affirming summary judgment and the denial of Hague's motion for a new trial.

The applicable State Farm insurance policy states that an insured is entitled to recover as UIM benefits damages that the insured is "legally entitled to collect" from "the owner or driver of the uninsured motor vehicle or underinsured motor vehicle." (Emphasis omitted.) In order to be legally entitled to collect, "the insured must be able to establish fault on the part of the uninsured motorist." *Voland v. Farmers Ins. Co. of Ariz.*, 189 Ariz. 448, 451, 943 P.2d 808, 811 (App. 1997) (citation omitted); *accord Transnat'l Ins. Co. v. Simmons*, 19 Ariz. App. 354, 356-57, 507 P.2d 693, 695-96 (1973) ("The words 'legally entitled to recover' simply mean that the insured must be able to establish fault on the part of the uninsured [or underinsured] motorist which gives rise to damages and must prove the extent of those damages."). Thus, for Hague to establish her entitlement to recover UIM insurance, she was required to prove fault on the part of the van driver involved in the April 2008 collision.

¶28        Before trial, Stevens made clear that fault was a disputed issue Hague was required to prove. In the parties' joint pretrial statement, Stevens asserted the issue of fault on the part of the van driver involved in the fatal collision with Christopher was contested.[15]

¶29        At trial, in response to her counsel's query as to how Christopher had passed away, Hague, who did not witness the accident, testified without objection, "I guess he was driving down Scottsdale Road and the gentleman turned and he hit into him."[16] Hague also responded affirmatively when next asked the compound question, "Did you bring a claim against this other driver that turned –- what happened was the gentlemen [sic] driver turned left in front of him?" Hague presented no other evidence of the details of the accident, although she testified she had collected $100,000 each from the van driver's insurance company and from State Farm through her UIM insurance coverage. When Hague's counsel asked, "[a]nd did they tell you how much fault they put on the other

_____

[15]        Stevens maintained Christopher "was the only motorist at fault or was the principal motorist at fault for the collision that resulted in his death," and that due to Christopher's "sole or nearly total fault for causing the accident that resulted in his death," Hague had been fully compensated by the amounts previously paid through insurance.

[16]        Similarly, Stevens acknowledged during his testimony that he had been made "aware" the case involved an accident between Christopher and the driver of a van, in which "Mr. Hague struck the van as it was making a left turn" at an intersection.

driver," counsel for Stevens objected on hearsay and foundation grounds, and the trial court sustained the objection. Hague did not otherwise seek to admit the Scottsdale Police Department's traffic accident report or any other documents addressing the issue of fault, and she did not present testimony from any police officers, accident reconstructionists, or witnesses present at the accident.

¶30　　　　After Hague rested at the close of her case-in-chief, Stevens moved for a directed verdict (judgment as a matter of law), arguing (1) A.R.S. § 20-259.01(A) and (B) established the statutory duties applicable to Stevens, and Stevens had met the applicable standard of care by providing Hague and Polak a written offer of UM/UIM coverage limits equal to the liability coverage limits on the Yamaha, and (2) in any event, Hague had not met her burden of showing she had been damaged by any breach on the part of Stevens because she had failed to provide evidence the driver of the van was at fault for the April 2008 accident; thus, Hague could not show she would have been eligible to recover more than the $100,000 UIM coverage limits she had already received from her State Farm policy.

¶31　　　　Counsel for Hague argued that the fact the insurance companies had paid under their policies should be sufficient to find fault on the part of the van driver, but the trial court noted that insurance companies may pay a claim for "cost of defense kind of reasons that don't involve an actual decision and an actual investigation into a determination of fault," and stated, "I don't know if they did [an investigation or found fault] or not because there was no evidence presented to me on that." Counsel for Hague then argued that both Hague and Stevens had referred to "a person who turned left at an intersection in front of Mr. –- we know the facts of the accident." The court replied, however, that Hague had failed to "put on any evidence of the facts of the accident" except "hearsay testimony about he said someone turned left, but that is –- that is not enough to establish fault."

¶32　　　　Counsel for Hague moved to reopen her case, but counsel for Stevens objected, arguing "we supplemented our disclosure to be very clear that we contested liability here," and noting the pretrial statement had been "correct[ed]" by redacting mention of the van's driver as being "at fault." Counsel for Hague argued that "the issue isn't how much [the van driver] was at fault" but "whether underinsured coverage was triggered," but the trial court rejected the argument and denied serial motions to reopen the case:

> Well, [counsel], I'm sorry that you didn't see this. I have to say these questions have been occurring to me all last week after we had the pretrial conference. I was frankly wondering how you were going to prove your case. And [] I was having an open mind to whatever it is that you decided to present.
>
> But you've rested. I mean, you've built your entire case on the theory that you've gone forward with and you've rested.
>
> And –
>
> . . . .
>
> [Counsel], I'm sorry, but I have heard enough. And there is – the plaintiff has not provided evidence of frankly it's causation evidence that Ms. Hague was caused damage because of any decision – well, actually it goes back to the motorcycle accident. There is no proof of [fault related to] that.

The trial court then granted Stevens' directed verdict motion.

¶33 After entering judgment in favor of Defendants, however, the trial court granted Hague's motion for a new trial as to Stevens, reasoning as follows:

> The Court considered the parties' papers related to the instant motion, and reviewed the arguments of counsel related to Defendant's motion for a directed verdict. Upon reflection, the Court finds that reasonable jurors could find that Plaintiff's uncontradicted testimony – her "yes" answer to counsel's question that included "what happened was the gentleman driver turned left in front of him?" – was sufficient to establish some degree of fault on the part of the underinsured driver. For that reason, it was error for the Court to enter judgment as a matter of law in favor of Defendant, and a new trial is warranted.

On September 3, 2013, the trial court issued a signed minute entry entering judgment in favor of the Houston Agency and granting Hague a new trial as to Stevens.

¶34      Stevens argues the trial court erred in reversing its directed verdict ruling and granting a new trial as to Stevens because Hague failed to introduce substantial evidence from which the jury could determine that the van driver involved in the April 2008 collision with Christopher was legally at fault.  We agree.

¶35      Even assuming the ambiguous testimony provided was true, *see Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 543, 789 P.2d 1040, 1044 (1990),[17] it goes no further than to state at most that, as Christopher was proceeding down Scottsdale Road, he was involved in a collision with a driver executing a left turn in front of him.  No testimony was provided regarding such relevant facts as the direction of either motorist, each motorist's speed, or whether either driver had the right-of-way.[18]  Although we are aware that, in some instances, these and other potentially pertinent facts might not be ascertained, the jury must at least be presented with a "sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue."  Ariz. R. Civ. P. 50(a).  Hague's testimony was itself admittedly speculative, and to find fault on the part of the van driver based on the testimony presented, the jury would have to do more than draw inferences – it would have to speculate as to the material facts.[19]  Speculation is insufficient to prove the necessary elements of Hague's claim.  *See, e.g., Badia v. City of Casa Grande*, 195 Ariz. 349, 357, ¶ 29, 988 P.2d 134, 142 (App. 1999).  In this case, fault was clearly a contested issue Hague was required to prove, and the testimony presented failed to set forth any substantial evidence about the accident from which a reasonable jury could evaluate and determine whether the van driver violated any traffic laws or otherwise

---

[17]      We agree with Hague that a directed verdict is improper when a court must weigh the credibility of witnesses to determine the material facts presented.  *See Estate of Reinen v. N. Ariz. Orthopedics, Ltd.*, 198 Ariz. 283, 287, ¶ 12, 9 P.3d 314, 318 (2000).  Here, however, no assessment of witnesses' credibility is necessary to address the accident testimony.

[18]      As previously noted, the traffic accident report was not offered or admitted in evidence at trial.  *See supra* note 7.

[19]      For example, from the sparse testimony and lack of other evidence regarding fault admitted at trial, the jury would have had to speculate whether Christopher and the van driver were travelling in opposite directions before the collision occurred, or whether Christopher was following the van driver who was turning left in front of him.  *See generally* A.R.S. §§ 28-730(A) (2012), -772 (2012).

acted negligently, much less was at fault for the accident.[20] *See Goodman*, 229 Ariz. at 28, ¶ 6, 270 P.3d at 855.

**¶36** Because Hague failed to establish legal entitlement to UM/UIM benefits with admissible evidence of fault on the part of the van driver, the trial court abused its discretion in reversing its directed verdict ruling and granting a new trial as to Stevens. Accordingly, we reverse the court's order granting Hague's motion for a new trial.[21]

---

[20] We also reject Hague's argument that the payment of liability and UIM benefits under the insurance companies' policies constitutes evidence of fault on the part of the van driver in this case. As the trial court recognized, insurance companies may pay or settle claims for a variety of reasons, even when their insureds are not at fault. *See Brown v. Progressive Ins. Co.*, 860 A.2d 493, 508, ¶ 54 (Pa. Super. Ct. 2004) ("Progressive ultimately settled a [UIM] claim for $25,000.00 that it reasonably believed to be worth nothing. Cases may settle for any number of reasons, including reasons which are unrelated to the true value of the claim."). Here, the van driver's insurance company paid without acknowledging fault on the part of its insured, and we disagree with the suggestion of Hague's counsel that Stevens' testimony explaining the types of insurance could be construed to indicate a concession of fault on the part of the van driver. Moreover, even were we to assume *arguendo* that a determination of fault could be inferred from Stevens' testimony, the testimony provides no facts from which a jury could evaluate and determine the relative degrees of fault of the two drivers, and Hague's testimony does nothing to address this deficiency. The testimony presented simply fails to provide facts sufficient to present a jury issue on fault.

[21] Because we reverse on this basis, we do not address Stevens' additional arguments, including Stevens' challenge to the trial court's denial of Stevens' motion in limine to preclude the testimony of Hague's expert, Berry.

## CONCLUSION

¶37      For the foregoing reasons, we affirm summary judgment in favor of the Houston Agency and the trial court's denial of Hague's motion for a new trial as to the Houston Agency, reverse the court's order granting Hague's motion for a new trial as to Stevens, and remand with directions to enter judgment in favor of Defendants.  Defendants are awarded their taxable costs on appeal contingent upon compliance with Rule 21, ARCAP.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama